## Richmond

## WTAR RADIO-TV CORPORATION V. COMMONWEALTH OF VIRGINIA, ET AL.

April 22, 1977.

Record No. 760390.

Present, All the Justices.

*Conrad M. Shumadine (David Y. Faggert; Thomas E. Cabaniss; Kaufman, Oberndorfer and Spainhour,* on brief), for plaintiff in error.

*J. Durwood Felton, III, Assistant Attorney General (Andrew P. Miller, Attorney General; Philip R. Trapani, City Attorney* on brief), for defendants in error.

I'ANSON, C.J., delivered the opinion of the court.

WTAR Radio-TV Corporation (WTAR) filed an application in the court below for the correction of erroneous assessments of state retail sales and use taxes levied by the Commonwealth, the City of Norfolk and Sam T. Barfield, Commissioner of the· Revenue (hereinafter referred to collectively as the "Tax Department") and to recover the sum of $35,455.06, including interest, paid under protest. WTAR alleged *inter alia* that certain broadcasting "equipment and parts and accessories thereto" were exempt from such taxation by Code § 58-441.6(j), and that commercial advertising films were exempt by Code § 58-441.6(a). The trial court held, in a written opinion incorporated in its final order, that the items assessed by the Tax Department were not exempt under the statutes and dismissed the action.

The facts are not substantially in dispute. WTAR, pursuant to a license granted by the Federal Communications Commission (FCC), operates a VHF television station and both AM and FM radio stations in the Tidewater area. From December 1, 1967 through January 1, 1973, WTAR did not remit sales taxes on certain production items classified under the categories of studio lighting equipment, video-tape equipment, raw film, news gathering equipment, and props. The Tax Department determined that all this equipment was taxable when not used directly in broadcasting, and· prorated the sales taxes according to WTAR's percentage of exempt use.

During the time period in question, WTAR also produced commercial advertisements for its customers and broadcast them over its facilities. WTAR filed, as an exhibit, a copy of the bill to one of its customers showing a breakdown of the cost of preparation of an advertising film shown over its station. The bill listed separate charges for studio time, art work, dubs, and acting talent, rather than a lump sum due for the final product. WTAR's witnesses testified that the advertising films in question were usually retained by the studio and not delivered to the customers. However, the customer had the right to obtain

the advertising film if he chose to do so. The Tax Department determined that production of films by WTAR for commercial advertisements to be used over its station and elsewhere was a sale of tangible personal property and not exempt from the payment of sales taxes.

The first of the two issues presented involves the interpretation of Code § 58-441.6(j) which exempts:

"Broadcasting equipment and parts and accessories thereto and towers used or to be used by commercial radio and television companies or concerns which are under the regulation and supervision of the Federal Communications Commission."

WTAR contends (1) that "broadcasting" consists not only of the transmission of a signal over the air, but also of all processing, editing, and programming which goes into making up the signals, and (2) that regulation 1-88 promulgated by the State Tax Commissioner unduly restricts the language of the statute by making the exemption applicable only to tangible personal property used directly in "broadcasting."

On the other hand, the Tax Department contends (1) that "broadcasting equipment" for § 58-441.6(j) purposes refers only to "equipment and parts and accessories thereto and towers" actually used in the transmission of the signal from its source forward through the transmitter into the air, and (2) that regulation 1-88 constitutes a permissible exercise of the rule making power expressly delegated to the Tax Commissioner by Code § 58-441.41, as amended. Thus, the questions presented on the first issue are whether "broadcasting equipment" as used by the General Assembly in Code § 58-441.6(j) refers to "programming" as advocated by WTAR or to "transmitting" as the Tax Department contends, and whether regulation 1-88 is an unwarranted extension of the statute.

■ In determining the issues presented on this appeal, we follow our established rules of statutory construction. Virginia adheres to the rule of strict construction of tax exemptions. Taxation is the rule, not the exception. Therefore, tax statutes are strictly construed against the taxpayer. When a tax statute is susceptible to two constructions, one granting an exemption and the other denying it, the latter construction is adopted. *Winchester TV Cable Co.* v. *Commissioner*, 216 Va. 286, 289-90,

217 S.E.2d 885, 889 (1975). This policy is specifically mandated by the Virginia Constitution, Article X, § 6(f), and in all cases involving the construction of Code § 58-441.6 since the adoption of our revised Constitution, we have followed the rule of strict construction. *E.G., Winchester TV, supra; Dept. Taxation* v. *Prog. Com. Club*, 215 Va. 732, 734-36, 213 S.E.2d 759, 761-62 (1975).

The Virginia Retail Sales and Use Tax Act, Title 58, c. 8.1, does not define the word "broadcasting" as used in Code § 58-441.6(j). Thus, we must ascertain the legislative intent and give the word its proper meaning. *Commonwealth* v. *Community Motor Bus Co.*, 214 Va. 155, 157, 198 S.E.2d 619, 620 (1973).

WTAR first argues that the reference to FCC regulation in Code § 58-441.6(j) controls the meaning of the word "broadcasting" as it is used in that statute. Beginning with that premise, WTAR further argues that the chief concern of the FCC is with the quality of the station's programming. The argument continues that because the FCC is concerned with the quality of programming rather than with the mere emission of an electronic signal, "programming" for FCC purposes means "broadcasting" for sales and use tax purposes. We reject this argument.

Basing this exemption only on the fact of FCC regulation would completely ignore the language in the first part of the statute. We specifically rejected an analogous argument by ruling in *Winchester TV* that the word "broadcasting," rather than FCC regulation, governs the applicability of § 58-441.6(j). 216 Va. at 290, n. 2, 217 S.E.2d at 889, n. 2.

WTAR next asserts that the clear import of our decision in *Winchester TV* is that "broadcasting" encompasses all items of personal property which are necessary and essential to put a program on the air. Its reliance on *Winchester TV* is misplaced. That issue was not before us. There we said:

"At issue is applicability of the statutory exemption [to cable television operations] and not the extent to which it applies to specific items of property." 216 Va. at 287, 217 S.E.2d at 887.

The issue in *Winchester TV* was whether a community antenna television system (CATV) was "broadcasting" for § 58-441.6(j) purposes. In holding that the CATV did not qualify for the § 58-441.6(j) exemption, we relied on the dictionary

definition of the verb "broadcast." According to the dictionary, "broadcasting" means dissemination to "an *unlimited number* of receivers." 216 Va. at 290, 217 S.E.2d at 889. Because a CATV receives signals from other television stations, amplifies them and then sends them through wire only to its paying customers, we held that its activities did not qualify as "broadcasting."

Even though WTAR's reliance on *Winchester TV* is misplaced, that case is instructive in deciding the issues in the present case. There, we specifically rejected the contention that "programming equals broadcasting." 216 Va. at 288, 217 S.E.2d at 887-88. We also relied on an objective source to define the all-important word "broadcasting." As in *Winchester TV*, dictionary definitions illuminate the meaning of the word "broadcasting" in this case. The noun "broadcast" is defined as "the act of sending out sound or images by radio or television transmission . . . for general reception." Likewise as a verb, "broadcast" means "to send out from a transmitting station for an unlimited number of receivers" and "to send out radio or television signals." Even more importantly, the adjective "broadcast" means "cast or scattered in all directions" and "made public by means of radio or television." *Webster's Third New International Dictionary* at 280.

Thus, the accepted dictionary definition of "broadcasting" and its related forms resolves the question whether "broadcasting" means "programming" or "transmitting." The definitions focus on the fact of "dissemination" or "distribution," not on what is being disseminated. "Broadcasting" thus means "transmitting."

We also note other definitions of "broadcasting." The Federal Communications Act [FCA] defines "broadcasting" as follows:

> "[B]roadcasting means the dissemination of radio communication intended to be received by the public, directly or by the intermediary of relay stations." 47 U.S.C.A. § 153(o) (1970).

Interestingly, the FCA definition is very similar to the dictionary one. The FCA definition focuses on the intent to disseminate directly to the public, not the preparation of program materials for such dissemination.

*Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974) and *Fortnightly Corp.* v. *United Artists, Inc.*,

392 U.S. 390 (1968),[1] relied upon by WTAR, involve suits against CATV systems for copyright infringements. They do not lend support to WTAR's contention that broadcasting means programming.

WTAR also asserts that the Tax Department and the court below ignored the words "parts and accessories thereto" in interpreting the language of the statute. We do not agree. The language applies to parts and accessories of broadcasting equipment and towers used directly in the transmission of the signal from its source forward through the transmitter and into the air. *Winchester TV*, 216 Va. at 290, 217 S.E.2d at 889.

We hold that the broadcasting exemption applies only to broadcasting equipment and accessories thereto used directly in the act of disseminating a signal into the air, not to the equipment and accessories used to create the material which may be disseminated. This construction of the statute is not inconsistent with regulation 1-88 promulgated by the Tax Commissioner. Hence, the assessments made by the Tax Department on the items when used only in the production of programs, not in transmitting them, were not erroneous.

◼ The second issue presented in whether WTAR's sales of commercial advertisements are excluded from Virginia's retail sales and use tax pursuant to Code § 58-441.6(a), which exempts:

"Professional, insurance, or personal service transactions which involve sales as inconsequential elements for which no separate charges are made, [and] services rendered by repairmen for which a separate charge is made."

WTAR contends that the commercials are the end product of their employees' personal and professional skills and that the films which were used to show the advertisements are inconse-

---

[1] In *Fortnightly*, Mr. Justice Stewart, speaking for the Court, observed that "[t]he television broadcaster in one sense does less than the exhibitor of a motion picture or stage play; he supplies his audience not with visible images *but only with electronic signals*." (emphasis added) 392 U.S. at 398. That observation lends support to the Tax Department's contention and the trial court's finding that the term "broadcasting" encompasses only the process of transmitting electric signals, not the production of programs for transmission which is analogous to the stage production contrasted by the Court in *Fortnightly*.

quential elements of the transaction with its customers. Thus, WTAR argues that the commercials are exempt from sales taxes.

Code § 58-441.4 imposes a sales tax on every person who engages in the business of selling at retail or distributing tangible personal property, or who rents or furnishes any of the things or services taxable under the Virginia Retail Sales and Use Act.

Of relevance here is Code § 58-441.2(b), which provides:

" *'Sale'* means any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property. . . ."

Since the sales tax is levied and imposed only on tangible personal property, the personal service exception in reality exempts from taxation personal property transferred as an inconsequential element of a personal service transaction.

We have not previously considered the issue of when a sale of tangible personal property is an inconsequential element of a personal service transaction. The test applied by a preponderance of the authorities from other jurisdictions with sales tax statutes similar to our Virginia statutes is: if the "true object" sought by the buyer is the services *per se*, the exemption is available, but if the true object of the buyer is to obtain the property produced by the service, the exemption is not available. *Federated Department Stores, Inc.* v. *Kosydar*, 45 Ohio St. 2d 1, 340 N.E.2d 840 (1976), and numerous other Ohio cases there cited. *Accord, Dist. of Columbia* v. *Norwood Studios, Inc.*, 118 App. D.C. 358, 336 F.2d 746 (1964); *Green* v. *Sgurovsky*, 133 So. 2d 663 (Fla. App. 1961); *Cusick* v. *Commonwealth*, 260 Ky. 204, 84 S.W.2d 14 (1935). *Contra, Hawes* v. *Dimensions, Inc.*, 122 Ga. App. 190, 176 S.E.2d 602 (1970).

Applying the "true object" test to this case, we believe that parties purchasing commercial advertisements from WTAR were more interested in the final product than in the service that produced it. To be sure, the customer obtained the technical expertise of the production personnel, but some service is involved in the production of every article that is sold. However, the primary object and concern of the advertisers was to obtain a finished film with its special alignment of molecules and

chemicals which produce the images that advertise the customer's products when put on the air. Hence, we hold that the true object of the buyer of the advertisement was not the service *per se*, but the end product produced by the service.

WTAR also argues that its advertising films were exempt because it made no separate charge for the film itself. The evidence showed that an invoice to a customer itemized the separate charges for studio time, art work, "VTR" dubs, and talent. However, we do not find this evidence is dispositive of the issue. As the Commonwealth pointed out in oral argument, a bill for an oil painting could be divided into amounts spent for brushes and studio rental, neither of which actually form a part of the completed picture. Yet, the manner of computing the invoice cannot alter the fact that without a suitable finished product the painting would have no commercial value. Likewise, in the case of WTAR's advertising films, the method of computing the bill cannot alter the fact that the buyer was primarily interested in the completed film to be shown on the station rather than in the services involved in producing it.

WTAR's final argument is that Code § 58-441.4 could not apply to a production of advertising films if the films were never transferred to the customer. However, under the provisions of Code § 58-441.2(b), a sale means "any transfer of title or possession, . . . in any manner or by any means whatsoever, of tangible personal property." Hence, the showing of films over television was tantamount to a delivery of possession of tangible personal property to the buyer of the advertisement for which he paid a consideration, and WTAR furnished "the things or services" taxable under Virginia's Retail Sales and Use Tax Act. Even though WTAR does not usually transfer physical custody of its advertising films, it furnished and transferred the films to its customers by putting the electronic signals on the air which produced the buyer's advertisements. Moreover, the advertising film was available to the buyer if he desired it. The product the customer was buying was the advertisement, not the service that produced it.

For the reasons stated, the judgment of the court below is

*Affirmed.*